IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

  v.

THE CHILDREN'S INTERNET, INC., et al.

    Defendants.

No. C 06-6003 CW

ORDER DETERMINING REMEDIES FOR DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS

    The SEC has moved for the imposition of remedies against Defendants The Children's Internet, Inc. (TCI), Two Dog Net, Inc. (TDN), Nasser Hamedani, Sholeh Hamedani and Cort Poyner for their violations of the securities laws.  Defendants oppose the remedies sought by the SEC.  The matter was heard on August 14, 2008.  Having considered oral argument and all of the papers submitted by the parties, the Court orders the remedies set forth herein.

BACKGROUND

    The complaint charges Defendants with violating multiple provisions of the federal securities laws in connection with the unlawful sale of TCI securities.  The SEC reached an agreement with TCI, TDN and the Hamedanis that obviated the need for a trial on the merits.  Pursuant to the agreement, these Defendants agreed not

1  to contest liability and consented to the Court conducting a
2  hearing to determine the appropriate remedies for their violations.
3  Defendants agreed that, in the course of the remedies proceeding,
4  they would be "precluded from arguing that [they] did not violate
5  the federal securities laws as alleged in the Complaint" and that
6  the "allegations of the Complaint shall be accepted as and deemed
7  true by the Court." See, e.g., Docket No. 143 (consent of Nasser
8  Hamedani) at 2.  The Court thus accepts the allegations in the
9  complaint as true for the purposes of this motion.  The SEC was not
10 able to reach a negotiated settlement with Poyner, and the claims
11 against him went to trial.  A jury found Poyner liable on all of
12 the claims asserted against him.

13     TDN is a privately held corporation controlled by the
14 Hamedanis.  It aims to develop an internet portal for use by
15 children.  In early 2002, the Hamedanis executed a plan to raise
16 capital for TDN's operations by obtaining public investments.
17 Rather than make an initial public offering of TDN shares, they
18 decided to purchase a shell company which had no operations but had
19 existing common stock that could be publicly traded.  The Hamedanis
20 planned to raise capital by selling shares of the shell company to
21 investors.  The shell company would then obtain a license to TDN's
22 software.

23     Poyner, an associate of the Hamedanis with experience in
24 raising capital for businesses, located a suitable shell company
25 named DWC Installations.  He brought DWC to the Hamedanis'
26 attention in January or February, 2002.  Poyner stated that DWC had
27 over 1.1 million shares that could be publicly sold without delay.

2

The Hamedanis created a corporation named Shadrack Films, with Sholeh Hamedani as its sole shareholder, to acquire fifty-one percent of DWC's stock in July, 2002 for approximately $150,000. After designating Sholeh Hamedani DWC's sole officer and appointing relatives and associates to DWC's board of directors, the Hamedanis arranged for the acquisition of nearly all the remaining DWC stock by "nominees" under their control, including Nasser Hamedani's daughter, Soraiya Hamedani, and his nephew, Farzin Cigarchi. In December, 2002, the Hamedanis changed DWC's name to TCI. For his role in helping the Hamedanis acquire DWC, Poyner was given 50,000 shares of TCI stock.

Defendants raised the money used to purchase DWC by selling what they represented were shares of TCI, even though TCI did not yet exist and Defendants had not yet purchased the shares they were purporting to sell. By the time the Hamedanis made their first acquisition of DWC shares in July, 2002, Defendants had already sold more than 350,000 shares of TCI stock, at two dollars per share, to more than forty individuals.

The Hamedanis and their associates raised $2,722,344 from the sale of TCI shares to investors (A-investors) between February, 2002 and January, 2005. Although these investors were told that their TCI shares would be freely tradeable, these representations were not true, because there was no public market for TCI shares until February, 2005, when TCI first became publicly quoted on the OTC Bulletin Board. A number of other misrepresentations were made to investors to induce them to purchase TCI stock. In addition, investors were not told that Poyner received up to a twenty-five

3

percent commission, an unusually high amount.

Of the $2,722,344 that was raised from A-investors, $395,000 went to TCI's legitimate operating expenses; $365,000 went to brokers' commissions and TDN expenses; $150,000 went toward the purchase of DWC; and $1.2 million went to a checking account used by Nasser and Sholeh Hamedani for their personal expenses. The Hamedanis claim that the $1.2 million represents partial repayment of the approximately $2 million Nasser had previously loaned to the company. Neither the complaint nor the SEC's papers state how the remaining $612,344 was spent and, at the hearing, the SEC stated that these funds could not be traced.

The Hamedanis raised an additional $752,700 from investors (B-investors) between July, 2004 and June, 2005 through sales of what the investors were told was TCI stock directly from the company. The shares, however, were actually held and sold by Shadrack Films, and thus did not serve to raise new capital for TCI. Nor did the Hamedanis treat these proceeds as capital for TCI. Rather, they treated them as their own personal funds.

As noted, TCI became listed on the OTC Bulletin Board and a market was created for its stock in February, 2005. Prior to this, TCI stock was not registered with the SEC, and Defendants' sales before this date were therefore unlawful. After TCI stock was listed, Defendants profited by selling shares of TCI stock they already owned. Poyner sold the 50,000 shares of stock he had been given in exchange for locating DWC, netting a profit of $312,892. Nasser Hamedani arranged for brokerage accounts to be opened in the names of his daughter Soraiya and his nephew Cigarchi. Soraiya and

4

Cigarchi then sold their shares before other investors had received their stock certificates, which Nasser and Sholeh Hamedani purposely delayed issuing, and thus were able to take advantage of the relatively high share price during early trading while other investors were not. Soraiya netted $440,000 from her sales; Cigarchi netted $1.64 million from his. Of this amount, $1.6 million was transferred to Nasser Hamedani and $400,000 was given to his relatives.[1]

Defendants are now charged with, among other things, selling securities as to which no registration statement had been filed with the SEC; and making material misrepresentations and omissions in connection with the sale of securities.

## DISCUSSION

I.  Remedies Against Poyner

After trial, the jury found Poyner liable for four violations of the securities laws: 1) Section 15(a)(1) of the Securities Exchange Act of 1934 (the Exchange Act), for acting as a securities broker without registering as one; 2) Section 5 of the Securities Act of 1933 (the Securities Act), for selling unregistered TCI securities; 3) Section 10(b) and Rule 10b-5 of the Exchange Act, for making material false or misleading statements or omissions in connection with the sale of TCI securities; and 4) Section 17(a)(1) of the Securities Act, also for making material false or misleading statements or omissions in connection with the sale of securities. The SEC now seeks disgorgement of Poyner's gains from his

---

[1] The complaint does not account for the remaining $80,000.

5

involvement in raising funds for TCI. It also seeks civil penalties and an injunction prohibiting Poyner from violating the securities laws in the future and from participating in the offering of penny stocks.

### A. Disgorgement

District courts have "broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws." SEC v. First Pac. Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." Id. The court need not "trace every dollar" of the ill-gotten gains, but rather may order disgorgement of a "reasonable approximation of profits causally connected to the violation." Id. at 1192 n.6 (quoting SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1475 (2d Cir. 1996)).

The SEC seeks disgorgement of Poyner's commissions and the proceeds of his sales of TCI stock, an amount totaling $413,767. It also seeks pre-judgment interest on this sum in the amount of $61,118, for a total of $474,885.

#### 1. Poyner's Commissions

The SEC claims that the evidence at trial demonstrates that Poyner was paid $100,875 in commissions and fees from the sale of TCI stock. This evidence consists of the SEC's expert witness, an accountant, who arrived at the figure by identifying transfers to Poyner from TDN and Shadrack Films during the relevant time period.

Poyner does not dispute that he earned $100,875 in commissions. Instead, he argues that the only commissions that

should be disgorged are those from the sales of TCI stock to Daniel Sidenberg and Rafael Caliendo, the only investors whose testimony was offered at trial.[2]  He maintains that these are the only transactions for which the jury could have concluded that he acted as a broker, rather than a finder.  (Section 15(a)(1) of the Exchange Act does not require an individual to register as a securities broker if he acts only as a "finder.")  Poyner also suggests that the jury could not have found that he made misrepresentations or omissions to any investors other than Sidenberg and Caliendo.

Poyner's arguments against disgorging the full $100,875 are not persuasive.  The SEC's charges against Poyner at trial were not limited to violations in connection with the sales to Sidenberg and Caliendo; these investors gave testimony that was representative of other investors.  The fact that the jury found Poyner generally liable for violations of the securities laws implies that it concluded he was liable for his involvement in all of the sales of TCI stock that were proved at the trial, not just the sales to Sidenberg and Caliendo.  In addition, it is undisputed that none of the TCI shares were registered at the time they were sold.  Whether Poyner was acting as a finder or a broker, and whether he made misrepresentations or omissions, is irrelevant to this claim.  This claim alone can serve as the basis for disgorging the entire amount of Poyner's profits.  Thus, the full $100,875 in Poyner's commissions will be disgorged.

---

[2] The SEC introduced Sidenberg's and Caliendo's testimony in the form of a videotaped deposition.

2. Poyner's Sale of TCI Stock

As noted above, Poyner received 50,000 TCI shares as compensation for finding DWC for the Hamedanis. Poyner sold these shares after TCI stock started trading, netting $312,892. This figure is supported by the declaration of an SEC accountant who analyzed confirmation slips from the trades.

Poyner argues that finding DWC for the Hamedanis was not itself a violation of the securities laws, and thus the shares he was given in exchange should not be subject to disgorgement. The SEC correctly notes, however, that the purchase of DWC was an integral part of the fraudulent scheme to raise capital through illegal stock sales. Poyner's profits from his involvement in the scheme are subject to disgorgement, and thus the net proceeds from his sales will be disgorged.[3]

3. Pre-Judgment Interest

The SEC seeks pre-judgment interest in the amount of $61,118. It has submitted a declaration from its accountant explaining how this figure was calculated. Poyner does not contend that the calculation is incorrect, but he argues that it would be unjust to award pre-judgment interest, given that the SEC took six years from the time of the violations to bring this matter to judgment. However, the length of time between Poyner's violations and the judgment against him is not relevant to the issue of whether he

---

[3] Poyner argues that, if disgorgement is ordered, the Court should disgorge only $100,000, the value of the TCI shares at the time Poyner received them. But Poyner benefitted by selling the shares at a price far above their initial value, and he is not entitled to keep the profit.

8

1  should pay pre-judgment interest.  The purpose of awarding pre-
2  judgment interest here is to prevent Poyner from keeping the
3  interest he earned (or could have earned) by investing the funds
4  that are now subject to disgorgement, and thereby benefitting from
5  his violations.  Accordingly, Poyner will be assessed pre-judgment
6  interest in the amount of $61,118.

  B. Civil Penalties

  Under the Exchange Act, the Court may impose a civil penalty for Poyner's violations.  15 U.S.C. § 78u(d)(3)(A).  The maximum amount of the penalty depends on which of three tiers the violation falls within:

> (i) First tier
>
> The amount of the penalty shall be determined by the court in light of the facts and circumstances.  For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.
>
> (ii) Second tier
>
> Notwithstanding clause (i), the amount of penalty for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.
>
> (iii) Third tier
>
> Notwithstanding clauses (i) and (ii), the amount of penalty for each such violation shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if--
>
> > (aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate

9

```
            or reckless disregard of a regulatory requirement;
            and

            (bb) such violation directly or indirectly resulted
            in substantial losses or created a significant risk
            of substantial losses to other persons.
```

Id. § 78u(d)(3)(B).  The same scheme governs civil penalties for violations of the Securities Act.  See 15 U.S.C. § 77t(d)(2).  The fines for individuals increased to $6,500, $60,000 and $120,000 in 2001 to account for inflation.  See 17 C.F.R. § 201.1002.

The SEC seeks civil penalties against Poyner in the amount of $120,000, representing a $30,000 penalty for each of the four securities laws Poyner was found to have violated.  The SEC contends that all four of Poyner's violations fall within Tier II because they involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  This position is supported by the jury's verdict.  In addition, unless civil penalties are imposed, Poyner will not have incurred any meaningful economic cost as a result of his violations; he merely will have been stripped of his ill-gotten gains.  Accordingly, the Court will impose civil penalties against Poyner in the amount of $120,000.

C.   Injunctive Relief

1.   Prohibition on Violating the Securities Laws

The Exchange Act provides:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, . . . it may in its discretion bring an action in the proper district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

10

15 U.S.C. § 78u(d)(1).[4]  The Securities Act contains language that is identical in all material respects.  Id. § 77t(b).

The SEC seeks an injunction that would prohibit Poyner from again violating the securities laws he was found to have violated by the conduct that is the subject of this action.  In SEC v. Fehn, 97 F.3d 1276 (9th Cir. 1996), the Ninth Circuit addressed when an injunction of the type the SEC seeks is appropriate:

> To obtain a permanent injunction, the SEC ha[s] the burden of showing there [is] a reasonable likelihood of future violations of the securities laws.  We acknowledge that there is no per se rule requiring the issuance of an injunction upon the showing of a past violation, but . . . the existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction.
>
> In predicting the likelihood of future violations, we must assess the totality of the circumstances surrounding the defendant and his violations, and we consider such factors as (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

Id. at 1295-96. (citations and internal quotation marks omitted).

Considering these factors, the Court concludes that there is a reasonable likelihood that Poyner will violate the securities laws in the future, and thus an injunction is appropriate.  Poyner's violations were not isolated, but were ongoing and made with scienter.  Poyner has shown no recognition of the wrongfulness of

---

[4] The Exchange Act further provides, "Upon application of the Commission the district courts of the United States . . . shall have jurisdiction to issue . . . injunctions . . . commanding . . . any person to comply with the provisions of this chapter."  Id. § 78u(e).

11

his conduct, and the fact that he is in the business of raising capital and thus is in a good position to defraud others in the future provides particular cause for concern. Accordingly, the Court will enjoin Poyner from violating the securities laws in the future.

### 2. Prohibition on Future Sales of Penny Stocks

The SEC also seeks to prohibit Poyner from dealing in "penny stocks," i.e., stocks that sell for less than five dollars. This request finds support in the Exchange Act, which provides:

> In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

15 U.S.C. § 78u(d)(6). The House Report on the Penny Stock Reform Act of 1990, which added the precursor of this provision, found that widespread abuses in the market for penny stocks called for increased regulation:

> Because it is wrapped in secrecy and operates in relative obscurity, the penny stock market lends itself to manipulation far more easily than a market where information is readily available and circulated to investors. Penny stocks are often thinly traded and this more readily facilitates control and domination by a single market maker. The securities thus become attractive vehicles for manipulative, artificial schemes which are intended to raise the price or volume of the securities, primarily for the benefit of the few anonymous insiders, and frequently, the brokerage firm itself, which often unloads its own shares of the stock into the market after it has manipulated the price of the stock skyward.

H.R. Rep. No. 101-617 (1990), reprinted in 1990 U.S.C.C.A.N. 1408, 1422.

12

The concerns raised by Congress are relevant here.  Given Poyner's involvement in raising funds through the sale of penny stock and his continuing activity in corporate finance (in particular, his involvement in a fitness beverage venture) the SEC's request is reasonable.  Accordingly, the Court will enter an injunction prohibiting Poyner from further dealing in penny stocks.

II.  Remedies Against the Hamedanis, TCI and TDN

The SEC seeks disgorgement against the Hamedanis, TCI and TDN. It also seeks civil penalties against the Hamedanis and an injunction prohibiting them from acting as officers or directors of publicly reporting corporations in the future and from participating in the offering of penny stocks.

A.  Disgorgement

The SEC seeks disgorgement in the amount of $5,555,044 from Nasser and Sholeh Hamedani, jointly and severally.  It also seeks to hold TCI jointly and severally liable for $3,475,044 of this amount and to hold TDN jointly and severally liable for $2,722,344 of the amount.

1.  Disgorgement of the Hamedanis' Gains

The SEC seeks disgorgement of $5,555,044 against the Hamedanis, corresponding to the proceeds from the sales of TCI stock to A-investors and B-investors and the sales of Soraiya's and Cigarchi's shares of TCI stock.  This figure, however, does not approximate the gains actually received by the Hamedanis. According to the allegations in the complaint, the Hamedanis did not keep the entire $5,555,044 million for themselves; some of the funds that were raised were spent on TCI's expenses and on other

13

items. A more reasonable approximation of the Hamedanis' ill-gotten gains is $3,552,700. This amount equals the sum of: 1) the $1.2 million of A-investor funds diverted to their checking account; 2) $752,700, representing the entire amount of B-investor funds, which the Hamedanis treated as their own; and 3) the $1.6 million given to them from the sale of Soraiya's and Cigarchi's stock sales.

The Hamedanis argue that the $1.2 million they diverted from A-investor funds was actually repayment of a loan that Nasser had given to TCI. Even accepting this as true, however, the complaint alleges that the transfer was improper and not in line with investors' expectations, and thus this amount should be disgorged. The Hamedanis also claim that the $1.6 million they received from the sale of Soraiya's and Cigarchi's shares was actually a loan that they must repay. They have submitted promissory notes supporting this allegation. The complaint, however, states that Nasser controlled the sale of these shares and received the proceeds himself. These allegations strongly imply that the $1.6 million was not a bona fide loan.

The Hamedanis also note that many of the shares of TCI stock sold through the accounts of Soraiya and Cigarchi were actually sold after other investors had received their stock certificates and could trade their shares. The SEC does not dispute this, but correctly points out that the sale of these shares was part of an overarching scheme by the Hamedanis to make money for themselves through the sale of TCI stock. Allowing the Hamedanis to keep the proceeds would enable them to benefit from their manipulation of

14

the market.

The Hamedanis argue that TCI's operating expenses should be subtracted from the gross revenue when calculating disgorgement. However, their submissions concerning TCI's expenses cannot be reconciled with the complaint, which states that, of the money raised from A-investors and B-investors, only $395,000 went toward legitimate business expenses. The Court has not included this amount in calculating disgorgement. Nor has the Court included the $365,000 that was spent on brokers' commissions and TDN expenses, the $150,000 that was used for the initial purchase of DWC or the $612,344 that is unaccounted for in the complaint. To the extent the Hamedanis submit that the $3,552,700 was used to pay for legitimate operating expenses, their allegations are contradicted by the complaint and are not properly asserted. Accordingly, the Court orders disgorgement of $3,552,700 from the Hamedanis.

The SEC also seeks to disgorge the TCI shares still owned by Sholeh Hamedani through Shadrack Films and the TDN shares owned by Nasser Hamedani. Currently, these shares are worth little. However, if TCI is eventually developed into a successful business, the Hamedanis could profit from their involvement in the TCI venture, notwithstanding their violations of the securities laws, by virtue of their continued financial stake in the companies. Accordingly, to prevent the Hamedanis from receiving such ill-gotten gains in the future, these shares will be disgorged. The shares must be deposited in a brokerage account. The respective corporations' boards and remaining shareholders may determine how to dispose of the shares, but must seek the Court's approval of any

15

disposition.  For purposes of establishing a quorum at a shareholder meeting, the disgorged shares shall be deemed present but not voting.

    2. Disgorgement of TCI's and TDN's Gains

  The SEC seeks to disgorge $3,475,044 from TCI, representing the funds raised from A-investors and B-investors.  However, the $752,700 in B-investor funds was given to Shadrack Films and treated by the Hamedanis as if it was their own.  TCI therefore did not benefit from these funds, and they are already being disgorged from the Hamedanis.  In addition, of the $2,722,344 raised from A-investors, $1.2 million was deposited in the Hamedanis' checking account and was used for their personal expenses.  These funds also did not benefit TCI, and are subject to disgorgement already.

  Of the remaining $1,522,344 in A-investor funds, the complaint alleges that $395,000 went to legitimate TCI operating expenses, $150,000 went toward the purchase of DWC installations and $365,000 went to brokers' commissions and TDN's expenses.  As noted above, the complaint does not account for the remaining $612,344 in investor funds.  While some of these funds could potentially be subject to disgorgement, ordering disgorgement against TCI would not benefit the corporation's shareholders, who are the victims of the Hamedanis' unlawful conduct.  Nor does it appear that TCI would have the means to satisfy any order of disgorgement.

  The SEC also seeks disgorgement from TDN of the $2,722,344 raised from A-investors, on the basis that those investors allegedly sent their payments to TDN.  But even so, this does not demonstrate that TDN benefitted from its receipt of the funds.  To

16

the contrary, the complaint specifies that only a small amount of these funds -- an unspecified portion of $365,000 -- went toward TDN's operating expenses.  Although this amount could potentially be disgorged, doing so would penalize third party TDN shareholders who were not responsible for the violations.

The Court concludes that ordering disgorgement only against the Hamedanis individually and divesting them of their interest in TCI and TDN is the most appropriate remedy under the circumstances. This approach will offer TCI's shareholders the best hope of realizing a return on their investment.  Accordingly, the Court will not order disgorgement against TCI or TDN.

        3.    Pre-Judgment Interest

For the reasons discussed above, the Hamedanis must pay pre-judgment interest on any funds that are disgorged.  The SEC's calculation of interest, however, is based on the amount of disgorgement it requested, not on the amount determined by the Court.  The SEC must therefore recalculate the amount of pre-judgment interest owed by the Hamedanis based on disgorgement in the amount of $3,552,700.  If the Hamedanis dispute the calculation, they may seek relief from the Court.

    B.    Civil Penalties

As with Poyner, the SEC seeks the imposition of civil penalties against the Hamedanis.  The three-tiered system discussed above applies to these penalties.  The SEC argues that the Hamedanis' violations fall within Tier III because they involved "fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in

17

substantial losses or created a significant risk of substantial losses to other persons." The SEC asks that the highest authorized penalty of $120,000 be imposed against each of the Hamedanis.

The Hamedanis disregarded fundamental principles of corporate governance and demonstrated a willingness to enrich themselves at the expense of their investors. The amount of any civil penalty against them must reflect their serious violations of the securities laws. Accordingly, the Court will impose a penalty of $100,000 against each of them. This amount is slightly less than the statutory maximum because the Hamedanis have expressed regret over the effects of their conduct on TCI shareholders.

C. Injunctive Relief

The SEC requests an injunction prohibiting the Hamedanis from serving as officers or directors of any publicly reporting company. Such a prohibition is appropriate given the reckless way in which the Hamedanis have managed the affairs of TCI, and the Court will therefore grant the SEC's request.

The SEC also requests that the Hamedanis be prohibited from participating in the offering of penny stocks. Considering the Hamedanis' manipulation of investors in connection with the offering of penny stocks, this relief is also appropriate. The Court will therefore grant this request as well.

CONCLUSION

For the foregoing reasons, the Court orders the following remedies:

Defendant Cort Poyner shall pay to the SEC $474,885 in disgorgement and pre-judgment interest, and $120,000 in civil

18

penalties.  He shall be permanently enjoined from violating the securities laws in the future and from dealing in penny stocks.

Defendants Nasser and Sholeh Hamedani shall pay to the SEC $3,552,700 in disgorgement, and pre-judgment interest in an amount to be determined.  They are jointly and severally liable for payment of this sum.  All TCI shares owned by Shadrack Films and all TDN shares owned by Nasser Hamedani shall also be disgorged. Nasser and Sholeh Hamedani shall each pay $100,000 in civil penalties.  They shall be enjoined from acting as directors of any publicly reporting company and from participating in the future offering of penny stocks.

The SEC shall submit a proposed judgment and injunction(s) within ten days of the date of this order.

IT IS SO ORDERED.

Dated: 10/03/08

CLAUDIA WILKEN
United States District Judge