IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>CHILDREN'S INTERNET INC., et al.,<br><br>    Defendants.<br>_____/ | No. C 06-06003 CW<br><br>ORDER FOR FURTHER FINANCIAL DOCUMENTATION FROM DEFENDANT ON PLAINTIFF'S MOTION FOR CONTEMPT |

    Plaintiff Securities and Exchange Commission brings this motion for contempt against Defendant Cort L. Poyner on the ground that he has not paid the disgorgement of $413,767 or the prejudgment interest of $61,118 as required by the Court's November 3, 2008 Revised Judgment as to Defendant Cort L. Poyner.  He has never paid any portion of this amount or demonstrated any efforts to pay.  Defendant Poyner opposes the motion on the ground that he is destitute and unable to pay the judgment.  The matter was heard on July 9, 2009. Having considered the papers filed by the parties and oral argument on the motion, the Court orders further documentation from Poyner.

PROCEDURAL BACKGROUND

In September, 2006, Plaintiff filed this case against Defendants The Children's Internet (TCI), Two Dog Net, Inc., Nasser Hamedani, Sholeh A. Hamedani, Peter A. Perez, and Cort L. Poyner, alleging a scheme to sell unregistered TCI shares to investors through material misstatements and omissions. On April 3, 2008, a jury found Poyner liable for violating Sections 5 and 17(a)(1) of the Securities Act of 1933 and for violating Sections 10(b) and 15(a)(1) and Rule 10b-5 of the Securities Exchange Act of 1934. Thus, it was apparent as of this early date that some amount of payment from Poyner would be ordered. On August 14, 2008, the Court held a hearing on Plaintiff's motion for equitable and legal remedies against Poyner and on October 3, 2008, the Court issued an Order Determining Remedies for Defendants' Violation of the Securities Laws (Remedies Order) in which it required Poyner to disgorge $100,875 that he received from commissions from his illegal sale of unregistered TCI shares and $312,892 in proceeds that he received from selling the shares. Remedies Order at 6-7 (Docket # 257). The Court also assessed $61,118 in prejudgment interest against Poyner. Id. at 8-9. On November 3, 2008, in an amended judgment, the Court ordered Poyner to pay disgorgement of $413,767 and prejudgment interest thereon in the amount of $61,118, within ten days after entry of judgment, to the Clerk of the Court. It is undisputed that Poyner has not paid any part of the judgment against him.

Meanwhile, on July 25, 2008, the United States Attorney for the Middle District of Florida filed a civil forfeiture action against Poyner, attaching certain real property, personal property

2

and financial accounts owned by Poyner that allegedly contained proceeds from Poyner's fraudulent sale of stock in a company called Edgetech International (Forfeiture Action). Poyner filed an emergency motion to vacate or modify the government's attachment of two trust accounts on the grounds, among others, that the attachment would create severe financial hardship for him. On December 29, 2008, Magistrate Judge Gary R. Jones issued his Report and Recommendation on the Forfeiture. Yun Dec., Ex. 2, (Forfeiture Report) at 15-22. Magistrate Judge Jones was skeptical of Poyner's claim of financial hardship, noting that the government had presented evidence that Poyner had received substantial payments two months before his emergency motion was filed, had not accounted for those payments, lived in a $2.75 million residence, owned a Bentley, leased a BMW and spent $30,000 to $40,000 per month on living expenses. The court noted that Poyner's financial statements indicated that he owned art work worth $50,000, a vintage guitar collection valued at $25,000 and furnishings for his 5,871 square foot residence. The court also pointed out that, even if Poyner did not have any other source of income, he owned significant assets with which to fund his substantial medical expenses. However, the court explained that it did not need to resolve whether Poyner's current financial situation was as dire as he claimed because he had not established that the funds in the seized accounts were the assets of a legitimate business, a statutory requirement for application of the hardship provision. On April 17, 2009, United States District Judge Kenneth Hodges issued an order adopting the Forfeiture Report as the district court's decision and denying Poyner's emergency motion.

3

## LEGAL STANDARD

A district court has the inherent authority to enforce compliance with its orders through a civil contempt proceeding. International Union, UMWA v. Bagwell, 512 U.S. 821, 827-28 (1994). A contempt sanction is considered civil if it "is remedial, and for the benefit of the complainant." Id. A contempt fine is considered civil and remedial if it either "coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." United States v. United Mine Workers, 330 U.S. 258, 303-304 (1947).

If a person disobeys a specific and definite court order, he or she may properly be held in contempt. In re Crystal Palace Gambling Hall, Inc., 817 F.2d 1361, 1365 (9th Cir. 1987). A party disobeys a court order when it "fails to take all the reasonable steps within [its] power to insure compliance with the [court's] order." Id. (citation omitted).

In deciding whether to impose a civil contempt sanction, a district court should consider the following factors: the harm from non-compliance; the probable effectiveness of the sanction; the contemnor's financial resources and the burden the sanctions may impose; and the contemnor's willfulness in disregarding the court's order. United Mine Workers, 330 U.S. at 303-304.

The moving party must demonstrate by clear and convincing evidence that the contemnor violated the court's order. In Re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (citing Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir. 1982)); Balla v. Idaho State Bd. of Corrections, 869 F.2d 461, 466 (9th Cir. 1989). The

4

burden then shifts to the respondents to demonstrate that they have performed "all reasonable steps within their power to insure compliance" with the court's orders. Stone v. City and County of San Francisco, 968 F.2d 850, 856 (9th Cir. 1992), cert. denied, 506 U.S. 1081 (1993). A party may escape contempt by demonstrating that he or she is unable to comply with the court's order. In re Crystal Palace, 817 F.2d at 1365. In order to prevail on this defense, the alleged contemnor must submit evidence to support it. Combs v. Ryan's Coal Co., Inc., 785 F.2d 970, 984 (11th Cir. 1986) (contemnor's financial statements were inadequate because they were incomplete, unverified, not based on independent audits, and not accompanied by current tax returns).

## DISCUSSION

Plaintiff argues that the failure to disgorge is subject to civil contempt proceedings because the disgorgement order was equitable in nature. See SEC v. Rind, 991 F.2d 1486, 1493 (9th Cir. 1993) (disgorgement is a form of injunctive relief for statute of limitations purposes); SEC v. AMX, Int'l, Inc., 7 F.3d 71, 74-75, n.6 (5th Cir. 1993) (disgorgement order considered to be an injunction in the public interest and, thus, compliance may be compelled though civil contempt proceedings). Poyner does not dispute this.

Plaintiff next argues that it has met its burden to show by clear and convincing evidence that Poyner violated the Court's order by not paying the disgorgement amount or the prejudgment interest, or any of it. Plaintiff also argues that the findings in the Forfeiture Report demonstrate that Poyner will be unable to justify his failure to make any payment to the Clerk of the Court.

5

Poyner does not dispute that he has not paid any of the money required by the judgment against him but argues that he should be excused from paying it because he has demonstrated that he is destitute.  He also argues that the Forfeiture Report cannot be used as evidence of his present financial situation because collateral estoppel does not apply and his financial situation in 2008 has no relationship to his present financial condition.

Poyner is correct that the doctrine of collateral estoppel or issue preclusion does not apply here.  Collateral estoppel bars the relitigation of issues actually adjudicated in previous litigation between the same parties.  <u>Kamilche Co. v. United States</u>, 53 F.3d 1059, 1062 (9th Cir. 1995), <u>opinion amended on other grounds</u>, 75 F.3d 1391 (1996).  Collateral estoppel applies only if an issue was "actually and necessarily determined" in the prior case.  <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979).  In the Forfeiture Action, although Poyner argued that his financial situation was so dire that the government's attachment of his two trust accounts should be vacated, the court declined to rule on this ground and instead denied Poyner's motion because he had not established that the funds in the accounts were the assets of a legitimate business.  Therefore, the issue of Poyner's financial situation was not actually and necessarily determined in the Forfeiture Action and cannot be used to preclude litigation of this issue here.

Poyner is also correct that his financial condition in 2008 is not determinative of his current circumstances.  However, Poyner has not shown that he is unable to pay the judgment or that he has taken all reasonable steps within his power to insure compliance with it.

6

Poyner has submitted three declarations in support of his argument that he is destitute: the declaration of Susan Wolfe, an attorney who represented Poyner in the Forfeiture Action; the declaration of Alan Lederfeind, former president and Chief Executive Officer of Wall Street Discount Corporation, a registered broker-dealer firm, who was trustee of the two trusts at issue in the Forfeiture Action, Mazel Tuff Trust #1 and Mazel Tuff Trust #2; and the declaration of Poyner himself.  In her declaration, Wolfe merely summarizes the proceedings in the Forfeiture Action, as discussed above.  In his declaration, Lederfeind discusses the assets and distributions of the two trusts.  Mazel Tuff Trust #2 held an annuity from the Hartford Financial Service Group from September, 2007 to February, 2008.  Lederfeind Dec. at ¶ 4.  In his role as trustee, Lederfeind made payments from Mazel Tuff Trust #2 of $15,000 per month for the mortgage on Poyner's house and $16,000 per month to Poyner and Marcie McNeely, allegedly Poyner's former live-in companion, "to help pay their stratospheric living expenses, including expensive dialysis treatments administered to Poyner in his home every other day and payments for very expensive cars."  Id.  In March, 2008, more than $2 million

> was deposited into an account at First Republic Bank in the name of Mazel Tuff Trust #2.  The vast majority of that money was still maintained in two Mazel Tuff Trust #2 accounts at First Republic Bank in July, 2008 when Federal law enforcement agents seized it.  From those moneys I caused the trust to pay, prior to the seizure, a total of approximately $90,000 to Mr. Poyner's attorneys Steven Altman and Robinson Brog et al., $10,000 to a charitable organization in Miami, and the continuing mortgage payments for Mr. Poyner's house.  The only two extraordinary payments from the trusts to Mr. Poyner or his entities during that period were in the amounts of $30,000 and $100,000 which I understood and understand were needed to cover Mr. Poyner's living expenses.

Lederfeind Dec. at ¶ 5.  Lederfeind states that he is not aware of any other valuable assets owned or controlled by Poyner.  Id. at ¶ 6.  Lederfeind states that Mazel Tuff Trust #1 never had more than $20,000 in assets.  Id. at ¶ 5.

In his declaration, Poyner states that he has no money and no immediate prospects of making money because, in the Forfeiture Action, the government seized all of his money and most of his financial records, that he is now living on Social Security benefits and food stamps and is receiving Medicaid to pay for his high medical costs due to a recent kidney transplant.  Poyner Dec. at ¶ 1.  Poyner acknowledges that, until one year ago, he lived a lavish life style in that he owned a $2.7 million house in Delray Beach, Florida and a Bentley, leased a rare BMW, ate at fancy restaurants and paid lawyers large sums of money to work for him.  Id. at ¶ 2.  He states that he was

> able to make large sums of money in the securities industry to support that lifestyle. . . . In early 2007 I paid lawyers to establish two trusts, the Mazel Tuff Trust #1 and the Mazel Tuff Trust #2.  I deposited an annuity into one of those trusts and when that annuity expired I was persuaded to liquidate another annuity and deposit its proceeds, totaling more than $2,000,000, into an account in the name of Mazel Tuff Trust #2 . . . .  [M]oney passed through my hands at a fast pace . . . To take the most obvious example, in February and the spring of 2008 I received some $800,000 in repayments from a venture called Simply Fit Holdings Group, Inc. in which I participated.  I spent some of that money on business expenses but I also spent some of it to finance my lifestyle.  In July 2008 the Government seized the account into which I deposited that money.

Id. at ¶¶ 3, 4.

Poyner states that, after the government seized his assets in the Forfeiture Action, he

> submitted a "financial disclosure statement," a copy of which is annexed hereto as Exhibit D.  In it, I disclosed

8

> my substantial assets and estimated the "necessary" living expenses that I had been incurring up until the time of the seizure. My estimate of approximately $35,000 per month was, if anything, an understatement. For example, I did not believe that the cost of the cocaine I desperately needed to feed my addiction should be disclosed as a "necessary" expense on that form. I don't spend anything like those amounts now and have not done so since the seizure. To begin with, I have not made any mortgage payments on the house since then. . . . I don't go to fancy restaurants.

Id. at ¶ 7. He also states that all his cars have been seized by the government or repossessed for failure to make loan payments and that he has large amounts of credit card debt that he cannot pay. Id. at ¶¶ 7, 8. He states that his medical expenses are high because he needs medical care and expensive prescription drugs as a consequence of the kidney transplant he had last year. Id. at ¶ 9. In the last paragraph of his declaration, Poyner guarantees that "I do not have deposits at bank or brokerage accounts or other assets other than those disclosed herein and do not beneficially own any other assets with which I could pay any part of the disgorgement that the Court has ordered. . . And while I have not given up hope that I will be able to generate income in the future, I do not presently have the means or the connections to do so in the securities markets as I have for so many years in the past." Id. at ¶ 11.

    As correctly pointed out by Plaintiff, there are serious omissions in Poyner's financial submissions. Although Poyner argues that his 2008 financial situation cannot be used as proof of his current financial condition, the only financial statement he submits is one from 2008 which he submitted in the Forfeiture Action. And, there are many deficiencies in that financial statement: it is unsigned; it fails to disclose any litigation

9

Poyner is involved with, which Plaintiff asserts is done for the purpose of concealing litigation in which Poyner is alleged to have taken millions of dollars; it fails to disclose his sources of income in previous years or to describe how that income was disbursed; it fails to disclose transfers of assets valued at more than $2,500 in the last three years;[1] it does not include his income tax returns for the past several years; and it is not verified by an independent auditor.

Poyner seems to imply that because he receives social security payments, food stamps and medicare, he meets his burden regarding Plaintiff's contempt proceeding. However, he provides no authority that supports this theory. Furthermore, the Wolfe and Lederfeind declarations add nothing to Poyner's argument.

In addition, as Plaintiff indicates, Poyner fails to submit financial information for McNeely, his live-in girlfriend for the last ten years. Although Poyner states McNeely is his former girlfriend, Plaintiff submits evidence that indicates that McNeely is still involved with Poyner. Plaintiff filed a February 5, 2008 declaration that McNeely submitted in this case, in which she states that she has known Poyner for fourteen years and, for the last ten years, they have resided together and Poyner has provided for her adult son. Supplemental Yun Dec., Ex. 7. In May, 2003, Poyner appointed McNeely as his attorney in fact under a durable power of attorney, id., Ex. 8, in December, 2008, McNeely signed a certified mail receipt, under a power of attorney for Poyner, for papers addressed to Poyner from Plaintiff, id., Ex. 9, and in May,

---

[1] Poyner declined to answer item 31 on the financial statement form which requests the itemization of the transfer of such assets.

10

2009, correspondence regarding Poyner's food stamps from the State of Florida Department of Children and Families was addressed to McNeely, Poyner Dec., Ex. Q.  These documents support Plaintiff's theory that Poyner and McNeely are still in a relationship, even if it is only financial in nature, and that Poyner may have transferred cash or other assets to McNeely, especially given that Poyner declined to respond to the question on the 2008 financial disclosure form regarding transfers of assets.  A sworn declaration from McNeely addressing these issues would be helpful.

However, before the Court finds that Poyner has failed to meet his burden to show he is unable to pay any of the judgment against him and has made all reasonable efforts to do so, the Court will provide him the opportunity to remedy the deficiencies in his financial submissions noted above.  To do so, Poyner must submit complete financial statements showing his income, expenses, assets and liabilities from 2007 to the present.  These statements must also include Poyner's transfers of assets and tax returns for the last three years.  If it is Poyner's position that he is unable to document any aspects of his financial condition because of a seizure of his records, he must submit documents and a declaration verifying his efforts to obtain copies of the records.  Poyner must also submit a declaration explaining any reasonable efforts he has made to pay the judgment, such as asking the United States Attorney or the district court involved in the Forfeiture Action to set aside funds from the Mazel Tuff Trusts to pay the judgment, or attempting to sell his art collection, vintage guitars and excess furniture.

11

CONCLUSION

For the reasons stated above, the Court orders Poyner to submit further financial documentation in support of his opposition to Plaintiff's motion within four weeks from the date of this order.  Plaintiff may submit a response within one week thereafter and Poyner may submit a reply one week later.  After all the papers have been filed, the Court will set a new hearing date for Plaintiff's motion.

IT IS SO ORDERED.

Dated: 7/20/09

CLAUDIA WILKEN
United States District Judge